## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH A. HICKOK, | ) | CASE NO. 1:17CV1554 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Deborah A. Hickok, ("Plaintiff" or "Hickok"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends the Commissioner's final decision be VACATED and the case REMANDED for

further proceedings consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.   PROCEDURAL HISTORY

In April 2014, Hickok filed an application for POD and DIB, alleging a disability onset date of September 25, 2013 and claiming she was disabled due to fibromyalgia, sciatic nerve, thyroid disorder, torn rotator cuff, diverticulosis, bulging disc, restless leg syndrome, and arthritis.  (Transcript ("Tr.") 20, 188.)  The applications were denied initially and upon reconsideration, and Hickok requested a hearing before an administrative law judge ("ALJ").  (Tr. 20, 103-105, 107-109, 111.)

On February 23, 2016, an ALJ held a hearing, during which Hickok, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 35-74.)  On May 25, 2016, the ALJ issued a written decision finding Hickok was not disabled.  (Tr. 20-30.)  The ALJ's decision became final on May 22, 2017, when the Appeals Council declined further review.  (Tr. 1-6.)

On July 25, 2017, Hickok filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 13, 15.)  Hickok asserts the following assignments of error:

(1)   The ALJ erred in weighing and evaluating the medical opinion evidence, thereby failing to support the residual functional capacity determination by substantial evidence.

(2)   The ALJ failed to properly consider Plaintiff's myalgias.

(Doc. No. 12.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Hickok was born in November 1959 and was fifty-six (56) years-old at the time of her administrative hearing, making her a "person of advanced age" under social security regulations.

2

(Tr. 146.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  She has a tenth grade education and is able to communicate in English.  (Tr. 62.)  She has past relevant work as a grocery cashier (light, semi-skilled, SVP 3), gas station cashier (light, unskilled, SVP 2); and glass cross cutter (light, unskilled, SVP 2).  (Tr. 20, 40, 45.)

**B.      Relevant Medical Evidence[2]**

The record reflects Hickok established treatment with primary care physician Gwen Haas, M.D., on August 16, 2012.  (Tr. 394-395.)  She complained of left sided upper extremity pain and neck discomfort, rating her pain an 8 on a scale of 10.  (*Id*.)  Physical examination findings were normal.  (*Id*.)  Dr. Haas assessed cervical radiculopathy, paresthesia, ulnar nerve abnormality, and arm pain.  (*Id*.)  She prescribed Medrol and Flexeril and ordered imaging.  (*Id*.)  Dr. Haas also indicated Hickok should "continue light duty" at work.  (*Id*.)

An x-ray of Hickok's cervical spine showed "mild degenerative changes involving the lower cervical vertebral segments with moderate narrowing of the disc space and mild encroachment of bilateral neural foramina at the C5-C6."  (Tr. 419.)  X-rays of her left shoulder were unremarkable.  (Tr. 417, 418.)  An x-ray of Hickok's left elbow showed "deformity of the medical epicondyle of the distal left humerus with 3 corticated ossific densities in the adjacent soft tissues measuring between 1mm and 4 mm in diameter that may represent bone fragments likely due to previous remote trauma."  (Tr. 415.)

An MRI of Hickok's cervical spine showed (1) tiny midline herniation at C3-C4 touching the cord but not compressing it; (2) slightly right paramedian disc herniation at C4-C5 causing

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

minimal right anterior cord flattening; (3) broad-based spur/disc complex at C5-C6 causing mild anterior cord flattening as well as neural foramen narrowing primarily on the right; and (4) disc bulging at C6-C7 without cord impingement.  (Tr. 414.)

On August 31, 2012, Hickok returned to Dr. Haas with complaints of longstanding restless leg syndrome and "horrible pain" and numbness in the left arm.  (Tr. 391-392.)  Physical examination findings were again normal.  (*Id.*)  Dr. Haas prescribed Ropinirole for Hickok's complaints of restless leg syndrome, and referred her to neurosurgery for her cervical spine issues.  (*Id.*)

On September 26, 2012, Hickok complained of neck and left side body pain, which she rated a 6 on a scale of 10.  (Tr. 389-390.)  She also stated that recently "every bone in [her] body hurt."  (*Id.*)  Dr. Haas assessed cervical radiculopathy and polyarthralgia; prescribed Robaxin; and ordered lab work.  (*Id.*)

Hickok returned to Dr. Haas on December 11, 2012.  (Tr. 387-388.)  Dr. Haas noted Hickok had "surgery done on [cervical] spine and this relieved the numbness in arms and fingers of left arm."  (*Id.*)  Hickok continued to complain of shoulder pain, however, which she rated a 4 on a scale of 10.  (*Id.*)  On examination, Dr. Haas noted "weakness to abduction 2/5 on the left." (*Id.*)  She ordered an EMG and Nerve Conduction Study of Hickok's left upper extremity.  (*Id.*) Dr. Haas also noted Hickok was "unable to work as a cashier" and advised her to remain off work until her left shoulder is "more fully evaluated."  (*Id.*)

An MRI of Hickok's left shoulder taken a few days later showed the following: (1) a 9 mm segment of full-thickness tearing of the anterior insertional fibers of supraspinatus with 4 mm of retraction of the torn fibers in the region of the anterior footplate, with moderate to severe

underlying supraspinatus tendinopathy and mild marrow edema; (2) mild insertional

infraspinatus tendinopathy; (3) mild to moderate subscapularis tendinopathy; (4) mild

tendinopathy of the intra-articular long head of the biceps tendon; (5) mild glenchumeral

chondromalacia; and (6) mild degenerative change at the acromioclavicular joint.  (Tr. 404-405.)

Hickok returned to Dr. Haas six months later, on June 11, 2013.  (Tr. 384-385.)  She

complained of pain in her right knee, right calf, and lower back.  (*Id*.)  Hickok rated her pain a 10

on a scale of 10.  (*Id*.)  She indicated she had been seen in urgent care the previous month and

prescribed Tramadol and Flexeril but continued to complain of "widespread [musculoskeletal]

conditions."  (*Id*.)  Dr. Haas assessed calf pain, restless leg syndrome, low back pain, knee pain,

and sciatica.  (*Id*.)  She ordered imaging and referred Hickok to pain management physician

Matthew Keum, M.D.  (*Id*.)

An x-ray of Hickok's lumbosacral spine taken that date showed mild to moderate

degenerative changes in her lower thoracic and upper lumbar spines.  (Tr. 402.) An x-ray of her

right knee showed mild to moderate degenerative changes.  (Tr. 400.)  An ultrasound duplex

venous of Hickok's right leg showed no evidence of deep venous thrombosis.  (Tr. 399.)

On June 28, 2013, Hickok presented to Dr. Haas with complaints that "her whole body is

aching and not only back but knees, shoulders, arms, and [lower back]."  (Tr. 381-382.)  She also

reported a history of peptic ulcer disease and recent fecal incontinence and "stomach burning."

(*Id.*)  Physical examination findings were normal, but Dr. Haas noted ANA testing was "positive

though not strongly."  (*Id*.)  She referred Hickok to (1) rheumatology to rule out other conditions,

such as lupus; (2) orthopedic surgery to address her "history of untreated torn rotator cuff;" and

(3) gastroenterology to address her recent episode of fecal incontinence.  (*Id*.)  Dr. Haas also

5

indicated she authored a "note for OFF WORK."  (*Id.*)

On July 8, 2013, Hickok began treatment with gastroenterologist Neil Jacobson, M.D. (Tr. 301-302.)  She complained of shortness of breath, abdominal cramps, change in bowel habits, diarrhea, heartburn, back pain, memory loss/confusion, anxiety and depression.  (*Id.*)  Dr. Jacobson ordered an EGD with MAC (i.e., an esophagogastroduodenoscophy with monitored anesthesia care).  (*Id.*)

The record reflects Hickok underwent a CT of her abdomen and pelvis on July 15, 2013, which revealed "wall thickening of the sigmoid colon with inflammatory changes of the adjacent mesenteric fat and small amount of free fluid in the cul-de-sac, most likely due to acute diverticulitis."  (Tr. 299-300.)

On July 21, 2013, Hickok presented to the emergency room ("ER") with complaints of abdominal cramping/aching and bloody stool.  (Tr. 251, 254, 261.)  She rated her pain an 8 on a scale of 10.  (Tr. 263.)  A CT of her abdomen and pelvis taken that date showed diverticulosis. (Tr. 272-273.)  Hickok was treated with IV medication (Zofran and Morphine), which decreased her pain to a 5 on a scale of 10.  (Tr. 265.)  She was discharged home that same day in improved condition.  (Tr. 266.)  Hickok returned to Dr. Haas on August 1, 2013 for follow-up.  (Tr. 379-380.)  Physical examination findings were normal.  (*Id.*)

On September 3, 2013, Hickok returned to Dr. Jacobson.  (Tr. 295-296.)  He noted Hickok's EGD was negative and indicated she was "generally better" with some continued cramps and diarrhea.  (*Id.*)  Dr. Jacobson advised her to follow a diverticulitis diet and ordered a colonoscopy.  (*Id.*)  Hickok underwent the colonoscopy the following month, which was normal. (Tr. 292-293.)

On October 7, 2013, Hickok presented to Dr. Haas with complaints of "nagging and shooting" right side pain.  (Tr. 375-376.)  Physical examination findings were normal; however, Hickok's responses to depression screening indicated she was "severely depressed."  (*Id.*)  Dr. Haas referred Hickok to a psychiatrist, a surgeon for a possible scope of her abdomen, and to a urologist.  (*Id.*)

On October 18, 2013, Hickok underwent an MRI of her lumbar spine, which revealed (1) mild narrowing of the central canal at the L4-L5 secondary to bulging disc and mild degenerative changes involving facet joints; and (2) posterior annular tear at the L5-S1 with no herniated disc. (Tr. 354.)

Shortly thereafter, on October 22, 2013, Hickok presented to pain management physician Matthew Keum, M.D., with complaints of persistent lower back pain radiating to her right leg. (Tr. 342-347.)  She indicated her pain was worse with prolonged standing, prolonged walking, bending and stooping.  (Tr. 342.)  Hickok also reported tingling/numbness in her right lower extremity.  (*Id.*)  On examination, Dr. Keum noted the following:

- normal gait;

- normal muscle strength;

- paraspinal tenderness and sacroiliac joint tenderness on the right;

- limited range of motion due to stiffness and pain, especially with extension and right rotation;

- normal tone;

- decreased sensation to pinprick on the right lower leg and foot;

- decreased reflexes on the right knee and bilateral ankles;

- negative Babinski's bilaterally;

7

- negative straight leg raise bilaterally;

- tenderness along the L-5 paraspinal muscles;

- mildly positive Spurling's test;

- mildly positive radicular symptoms on the right leg;

- normal pulses;

- normal muscle bulk; and

- negative Romber's sign.

(Tr. 345-346.)  He assessed (1) lumbar spondylosis without myelopathy; (2) spinal stenosis of the

lumbar region; (3) displacement of lumbar intervertebral disc without myelopathy; (4) lumbar

radiculitis; and (5) lumbar sprain and strain.  (Tr. 347.)  Dr. Keum prescribed Cymbalta and

ordered an EMG.  (*Id*.)  He also recommended Hickok undergo a lumbar epidural block, which

she did on October 30, 2013.  (Tr. 340-341.)

On October 30, 2013.  (Tr. 340-341.)

Hickok underwent an EMG and Nerve Conduction Study of her right lower extremity on

October 22, 2013.  (Tr. 351-353.)  It showed (1) evidence of subacute right L5 radiculopathy; and

(2) no conclusive electrophysiologic evidence of focal neuropathy, peripheral neuropathy, or L-S

plexopathy.  (*Id*.)

On December 12, 2013, Hickok returned to Dr. Keum with complaints of "worsening

pain from head to toe."  (Tr. 334-339.)  She also reported "aching and soreness all over,"

difficulty getting out of bed, decreased energy, mild "all-over" weakness, sleep disturbance,

dizziness, headaches, and difficulty balancing.  (Tr. 334-336.)  On examination, Hickok was in

mild distress.  (Tr. 337.)  Dr. Keum noted "positive tender points throughout the body, without

new skin changes, consistent with Fibromyalgia syndrome."  (Tr. 338.)  He also noted many of

the same physical examination findings as Hickok's previous visit, including normal gait, normal muscle strength, positive paraspinal tenderness, limited range of motion due to pain and stiffness, decreased sensation to pinprick on the right leg and foot, decreased reflexes, negative Babinski's, negative straight leg raise, normal muscle bulk, and negative Romber's sign.  (Tr. 338.)  Dr. Keum assessed (1) unspecified myalgia and myositis; (2) polymyalgia; (3) polyarthralgia; (4) lumbar spondylosis without myelopathy; (5) spinal stenosis of the lumbar region; (6) displacement of the lumbar intervertebral disc without myelopathy; (7) lumbar radiculitis; and (8) lumbar sprain and strain.  (Tr. 339.)  He prescribed Topamax and recommended she perform daily stretching exercises and low impact aerobic exercises.  (*Id*.)

Hickok returned to Dr. Haas on February 21, 2014 with complaints of abdominal cramping.  (Tr. 372-373.)  Dr. Haas noted Hickok did not wish to attend physical therapy for her left shoulder nor did she wish to proceed with left shoulder surgery.  (*Id*.)  She further noted Hickok "refuses spinal injection for back pain and states that it was a horrifying experience." (*Id*.)  Dr. Haas referred Hickok to a rheumatologist.  (*Id*.)

On March 17, 2014, Hickok complained of restless leg syndrome and left elbow pain. (Tr. 370-371.)  Dr. Haas ordered an x-ray of her left elbow, which showed mild degenerative changes.  (Tr. 370-371, 397.)

Hickok presented to Dr. Keum on March 31, 2014.  (Tr. 327-333.)  She reported worsening chronic low back pain radiating to her bilateral thighs, legs, and feet, as well as tingling/numbness in her lower legs.  (Tr. 327.)  Hickok also complained of left elbow pain and mild numbness.  (*Id*.)  On examination, Dr. Keum noted normal gait, normal muscle strength, positive paraspinal tenderness, limited range of motion due to pain and stiffness, decreased

sensation to pinprick on the right leg and foot, decreased reflexes, negative Babinski's, negative

straight leg raise, positive Spurling's test, positive bilateral radicular symptoms to legs, decreased

sensation along the medial left forearm, mildly positive Tinnel's compression, normal muscle

bulk, and negative Romber's sign.  (Tr. 331-332.)  He ordered a lumbar epidural block, which

Hickok underwent on April 2, 2014.  (Tr. 324-325.)

Hickok returned to Dr. Haas on May 23, 2014.  (Tr. 368-369.)  Dr. Haas stated Hickok

"has ongoing fibromyalgia syndrome and has ongoing muscle aches and joint pains and is seen

recently by Dr. Roter. Dx fibromyalgia."  (*Id*.)  Physical examination findings were normal,

although Hickok rated her pain a 9 on a scale of 10.  (*Id*.)  Dr. Haas assessed restless leg

syndrome, cervical radiculopathy, gastroesophageal reflux disease, low back pain, and chronic

pain.  (*Id*.)

On August 12, 2014, Hickok returned to Dr. Keum with complaints of gradual,

worsening, chronic lower back pain radiating to her right leg.  (Tr. 317-323.)  She indicated

"feeling better" after the epidural block but was "not interested in more epidural block due to

discomfort." (Tr. 317.)  Physical examination findings were largely the same as her last visit with

Dr. Keum.  (Tr. 321-322.)  Dr. Keum referred Hickok to physical therapy, and prescribed

Topamax and Zoloft.  (Tr. 322.)

Hickok returned to Dr. Haas on October 10, 2014.  (Tr. 366-367.)  Dr. Haas noted Hickok

had multiple conditions, including fibromyalgia, left shoulder rotator cuff tear, lower back pain

and sciatica, restless limb syndrome, depression, and diverticulitis.  (*Id*.)  She indicated Hickok's

only remaining options are physical therapy and "reconsider surgery and injections in future as

per pain management recommendation." (*Id*.)  Physical examination findings were normal aside

10

from restricted range of motion in her left shoulder for abduction.  (*Id*.)

On that same date, Dr. Haas completed a questionnaire regarding Hickok's physical impairments.  (Tr. 361-363.)  She indicated diagnoses of chronic pain, sciatica and restless limb syndrome, cervical radiculopathy, left shoulder torn rotator cuff, diverticulitis, and depression. (Tr. 362.)  Dr. Haas stated Hickok suffered from fatigue, reduced mobility in her left upper extremity, lower back pain, and fibromyalgia.  (*Id*.)  She indicated Hickok had declined left shoulder surgery and lumbar injection.  (*Id*.)  When asked to describe "any limitations his/her impairment(s) imposes on the ability to perform sustained work activity," Dr. Haas indicated: "Works as cashier and therefore unable to perform repetitive upper extremity work and back issues [illegible] to perform lifting."  (Tr. 363.)  Dr. Haas concluded by stating Hickok "is requesting total disability."  (*Id*.)

On October 28, 2014, Hickok underwent a Doppler evaluation of her right lower extremity.  (Tr. 509.)  It found no evidence of deep venous thrombus.  (*Id*.)

On December 24, 2014, Hickok presented to Diane Eden, M.D., for treatment of depression.  (Tr. 423.)  Dr. Eden found Hickok's response to medication was "improved but not optimal."  (*Id*.)  Mental status examination findings were normal.  (*Id*.)  Dr. Eden characterized the severity of Hickok's symptoms as mild, but nonetheless increased her Zoloft dosage, added Hydroxyzine, and referred her to therapy.  (*Id.*)

On February 9, 2015, Hickok underwent an MRI of her right knee.  (Tr. 506-507.)  This study revealed the following: (1) a longitudinal horizontal tear along the tibial surface of the mid-body to central posterior horn of the medial meniscus; (2) grade 3 chondromalacia central outer margin of the medial femorotibial compartment with subtle equivocal subchondral stress fracture

11

outer margin of the femoral condyle; and (3) mild patellofemoral arthrosis.  (*Id*.)

The following month, Hickok underwent an MRI of her cervical spine, which revealed: (1) internal fixation from C5 to C7 by plates and screws from her previous surgery; (2) mild disc space narrowing at the C4-5 level with mild degenerative change; (3) a 2 mm central disc protrusion at C3-4 with mild canal narrowing and slight cord impingement; (4) a 2 mm central disc protusion at C4-5 with mild canal narrowing and slight cord impingement; and (5) a 2 mm osteophyte at C5-6 with mild canal narrowing without cord compression.  (Tr. 502-503.)

The record reflects Dr. Haas completed a second, undated questionnaire regarding Hickok's physical impairments.[3]  (Tr. 421-422.)  Therein, Dr. Haas identifies the "date of illness/injury/surgery" as approximately 2014 due to fibromyalgia.  (*Id*.)  She indicates Hickok is "not progressing" and notes she had been referred to orthopedics, vascular medicine, and pain management.  (*Id*.)  When asked to identify "other restrictions or limitations," Dr. Haas states Hickok is (1) unable to mobilize her right knee due to athroscopy in February 2015; (2) unable to lift her shoulder due to her rotator cuff tear; and (3) suffering from chronic pain.  (*Id*.)  Dr. Haas opined Hickok's hours should be reduced from 20 to 15 hours per week, and recommended she go on long-term disability "soon."  (*Id*.)

On August 3, 2015, Hickok presented to the ER for evaluation after she dropped a plate on her foot and injured her toe.  (Tr. 482, 484.)  On examination, the ER doctor found a subungual hematoma on her left great toe.  (Tr. 489.)  An x-ray of Hickok's left toes showed a "subtle nondisplaced fracture of the tuft of the first distal phalanx."  (Tr. 497.)  The hematoma

---

[3]  Although undated, the parties note the form references the fact Hickok underwent a right knee arthroscopy in February 2015.  Thus, it appears to have been completed sometime after that procedure.

was drained in the ER and Hickok was discharged home. (Tr. 492.)

Several months later, on October 7, 2015, Hickok returned to the ER with complaints of intermittent heart palpitations over the prior two weeks, as well as shortness of breath. (Tr. 435, 443.) Hickok underwent an EKG and chest x-ray, both of which were normal. (Tr. 450.) She was discharged home and referred to her primary care physician for a Holter Monitor. (*Id.*) The record reflects Hickok underwent a Holter Monitor Study in December 2015, which showed normal sinus rhythm and no significant tachydysrhythmias or bradydysrhythmias. (Tr. 428.)

On December 14, 2015, Hickok presented to vascular specialist Razieh Mohseni, M.D., for evaluation of "heaviness, restlessness, and tiredness with aching pain in both legs." (Tr. 424-425.) Hickok stated she suffered from varicose veins in both legs for many years and "they appear to be getting worse over time." (*Id.*) She indicated her symptoms were interfering with her daily activities, noting she "cannot stand longer than a few hours without pain." (*Id.*) On examination, Dr. Mohseni indicated normal gait and pulses, and no edema. (*Id.*) However, an ultrasound performed that date showed chronic venous insufficiency of both lower extremities. (Tr. 425, 427.) Specifically, this study revealed as follows:

> The right great saphenous vein is incompetent and enlarged at 5.8 mm. There are no incompetent perforators seen in the right lower extremity. The small saphenous vein on the right is enlarged at 5.3 mm and is incompetent. The great saphenous vein on the left is incompetent and enlarged at 5.7 mm. There are no incompetent perforators in the left lower extremity. The left small saphenous is normal in size at 2.1 mm and is competent.

(Tr. 425.) Dr. Mohseni found Hickok "has significant symptoms related to her venous insufficiency," noting "she has tried and failed compression stockings which never helped." (Tr. 426.) He recommended Hickok undergo ablation of her right great and small saphenous veins, ablation of her left great sapenous vein, and sclerotherapy to the enlarged and incompetent

13

branches of her bilateral lower extremities.  (*Id.*)

**C.      State Agency Reports**

**1.        Physical Impairments**

On July 7, 2014, state agency physician Michael Delphia, M.D., reviewed Hickok's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 86-88.)  Dr. Delphia determined Hickok could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 87.)  He also determined Hickok had unlimited push/pull capacity and could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Lastly, Dr. Delphia found Hickok had no manipulative, visual, communicative, or environmental limitations.  (*Id.*)

On October 15, 2014, state agency physician Leigh Thomas, M.D., considered Hickok's medical records and completed a Physical RFC.  (Tr. 97-99.)  Like Dr. Delphia, Dr. Thomas determined Hickok could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday. (Tr. 97-98.)  Dr. Thomas also found Hickok had unlimited push/pull capacity and could occasionally climb ramps/stairs, stoop, kneel, crouch and crawl.  (Tr. 98.)  Unlike Dr. Delphia, however, Dr. Thomas concluded Hickok had an unlimited capacity to balance and could never climb ladders/ropes/scaffolds.  (*Id.*)  Dr. Thomas also found Hickok's overhead reaching on the left was limited to occasional due to limited shoulder range of motion.  (Tr. 98-99.)

**2.        Mental Impairments**

On August 4, 2014, Hickok underwent a psychological consultative examination with

Herschel Pickholtz, Ed.D.  (Tr. 304-310.)  She reported experiencing "anxiety complaints since a year or two ago."  (Tr. 305.)  Hickok stated she was never treated for symptoms associated with an anxiety disorder, was not taking any psychiatric medications, and had never been hospitalized for psychiatric reasons.  (Tr. 305-306.)  She described her anxiety symptoms as follows:

> Without psychiatric medications, when asked to describe her current anxiety symptoms, she indicates she feels nervous, panicky and worried about her kids and the future.  The frequency of the anxiety symptoms occurs once a week and lasts 20-minutes per occurrence.  The severity of the anxiety is described as being within the mild range of impairment.  When asked what triggers the anxiety, she stated it was related to bills.   She is not experiencing and has not experienced paranoid delusional ideation or delusions of grandiosity.  She is not experiencing visual or auditory hallucinations at present and never has.  She did not report posttraumatic stress complaints.

(Tr. 306.)  When asked to describe her daily activities, Hickok indicated she took care of her hygiene daily; changed her clothing and washed her hair daily; vacuumed, mopped, and swept the floors twice per week; did the laundry once per week; shopped for food once per week; cooked dinner daily; and shopped for clothing twice per year.  (Tr. 308.)

On examination, Hickok was well oriented to person, place and time.  (Tr. 307.)  Her affect was appropriate, her mood was euthymic, and she denied any depressive symptoms.  (*Id*.) Hickok's speech and thought content were normal, and no significant signs of autonomic anxiety were noted.  (*Id*.)  Dr. Pickholtz found her "overall capacities for attention, concentration, memory and intellectual level functioning" fell within the low average range.  (Tr. 309.)  He also noted her gait and posture were unremarkable.  (Tr. 307.)

Dr. Pickholtz assessed an unspecified anxiety disorder, mild.  (Tr. 309.)  He found Hickok's "capacities to understand, remember, and carryout instructions for work comparable to the type of work she did in the past do not reflect any significant impairment."  (*Id*.)  With regard

15

to the category of attention, concentration, persistence and pace, Dr. Pickholtz found Hickok's "abilities to perform 1 to 3-step tasks comparable to the type of work she did in the past and appear to be slightly impaired at worst." (*Id.*)  With regard to her abilities to respond to supervision and coworkers, Dr. Pickholtz found no significant impairment.  (Tr. 309-310.)  Finally, he found Hickok was "slightly impaired at worst" with regard to her capacity to handle the stress and pressures of a work setting.  (Tr. 310.)

On September 5, 2014, state agency psychologist Deryck Richardson, Ph.D., considered Hickok's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 85.)  Dr. Richardson found Hickok was mildly restricted in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.  (*Id.*)  He concluded Hickok's mental impairments were non-severe.  (*Id.*)

On October 23, 2014, state agency psychologist Kristen Haskins, Psy.D., considered Hickok's medical records and reached the same conclusions.  (Tr. 95-96.)

**D.  Hearing Testimony**

During the February 23, 2016 hearing, Hickok testified to the following:

- She started the 11th grade but dropped out.  (Tr. 62.)  From 1999 to 2004, she worked at a factory, running warm glass through a cutting machine.  (Tr. 43.44.)  In that job, she was required to stand most of the day and lifted up to 20 pounds.  (Tr. 44-45.)

- Her last job was as a grocery store cashier.  (Tr. 51.)  She continues to work there approximately 15 to 20 hours per week.  (*Id.*)  Specifically, she works five hours per day, four days per week.  (Tr. 52.)  Her employer "works with [her]. . . because they understand the situation [she's] in."  (Tr. 52-53.)  She is permitted to take breaks in addition to her regular 15 minute breaks, noting "anytime I want to go back in the office and sit down I'm entitled to."  (*Id.*)  She does so once or twice per shift, for approximately 10 minutes.  (*Id.*)  In addition, she has stomach problems and is "pretty much in the bathroom constantly" when she's working. (Tr. 60.)  During a 5 hour shift, she goes to the bathroom at least five

16

or six times.  (*Id.*)  Further, she gets help at work with taking out the trash, etc. (Tr. 61.)

- She cannot work full time because of her physical health problems.  (Tr. 46.) She suffers from back pain that makes it difficult for her to stand or sit for too long.  (*Id.*)  She has vascular problems, which cause her feet and legs to swell. (*Id.*)  She also suffers from pain in her right knee and left arm, as well as left arm numbness.  (Tr. 47, 53.)  She has "really bad" fibromyalgia.  (Tr. 47.)  She has diverticulitis, which "flares up" sometimes and causes stomach pain and diarrhea.  (Tr. 57-59.)  Finally, she suffers from shortness of breath and chronic bronchitis.  (Tr. 55, 67.)

- She had back surgery "at one point."  (Tr. 56.)  She has bulging discs and back pain which make it difficult for her to bend or to stand for more than five hours per day.  (Tr. 55, 66.)  She can walk the length of "two or three houses," and then is out of breath and her legs and back hurt.  (Tr. 61-62.)  She can climb steps but has to stop at each step.  (Tr. 61.)

- She already had right knee surgery once, and has been told she needs another surgery on that knee.  (Tr. 55, 64.)  She is also supposed to have surgery on her left shoulder, and on her lower extremity veins.  (Tr. 64-65.)  However, she lost her insurance and cannot afford it.  (*Id.*)

- She is left-handed.  (Tr. 54.)  Due to her left arm pain and numbness, she cannot grip with her left hand.  (*Id.*)  She mainly uses her right hand.  (*Id.*)  She can lift two to three pounds and can reach straight out.  (Tr. 54-55.)  She cannot reach overhead.  (*Id.*)

- She suffers from anxiety. (Tr. 63.)  She took Zoloft but "didn't care for how it made [her] feel."  (*Id.*)  She has seen a mental health counselor for anxiety in the past but it was "short term." (Tr. 65.)  She is not currently taking any medication or undergoing counseling because she cannot afford it.  (Tr. 63, 65.)  Prior to losing her insurance, she took Zoloft, Mobic, Trazodone, and Ibuprofen.  (Tr. 63-64.)

The VE testified Hickok had past work as a grocery cashier (light, semi-skilled, SVP 3),

gas station cashier (light, unskilled, SVP 2), and glass cross cutter (light, unskilled, SVP 2).  (Tr.

40, 45.)  The ALJ then posed the following hypothetical question:

> For the first hypothetical, please assume that the individual would be limited to light work.  That person additionally is limited to occasional climbing of ramps and stairs and that person cannot climb ladders, ropes, or scaffolds.  That person, in

17

addition, can only occasionally stoop, kneel, crouch, or crawl.  And overhead reaching, in this example please assume that the person cannot perform overhead reaching * * * on the left.  In this particular hypothetical, would that individual be able to perform any of Ms. Hickok's past work?

(Tr. 68.)

The VE testified the hypothetical individual would be able to perform Hickok's past work as a grocery cashier, gas station cashier, and glass cross cutter.  (Tr. 68.)  Hickok's counsel then questioned the VE regarding this hypothetical further, as follows:

Q:      If the criteria in hypothetical one changes to no overhead reaching with the dominant hand, does that change your answer?

A:      I would have to rule out the gas station cashier.

Q:      And why is the normal cashier not excluded?

A:      Well, it would only be excluded if the person was also doing some stocking.

Q:      And is that not a duty of a typical cashier then? Is it in your experience that a normal cashier does not stock?

A:      Some – some do.  I just did not see it in the record and I didn't hear that in the testimony.  I may have missed it, so —

ALJ:    Is it per the Dictionary of Occupational Titles just so I'm clear is that over – no overhead reaching, is that what– for the I guess it's the grocery store job that could still be done? . . .

VE:     Yes, unless she was actually doing stocking of the items when she was not doing cashiering.

ALJ:    Okay.  But that would be as actually performed and not per the Dictionary of Occupational Titles though. Is that correct?

VE:     Well the DOT does indicate that – that stocking could be possibly, not – not always a – you know one of the responsibilities of a grocery cashier.  So if we go strictly by that, then the answer would be, no, could not perform that job.

ALJ:    Okay.  Do you do stocking duties now?

18

CLMT:  We do– we do do stocking where I work at.

ALJ:  Do you do stocking duties now?

CLMT:  I do the light stuff if I could.

ALJ:  What kind of light stocking do you do now?

CLMT:  It would be like candy, bubblegum.

ALJ:  Okay. And do you do any stuff where you have to put it on higher shelves?

CLMT:  No.

*  *  *

ALJ:  Okay. Does the Dictionary of Occupational Titles discuss dominant hand versus non-dominant hand?

VE:  No it does not.

ALJ:  So . . . this isn't necessarily conflicting with the DOT.  It's just not discussed. Is that correct?

VE:   Correct.

(Tr. 68-70.)

The ALJ then asked a second hypothetical as follows: "And if the person due to their impairments were unable to complete a 40 hour workweek and were only able to . . . stand or walk for a total of five hours a day, would that person be able to engage in competitive employment?"  (Tr. 73.)  The VE testified such an individual would be "relegated to a very reduced range of light work, to essentially sedentary."  (*Id*.)

The VE also testified the "need to be in close proximity to a restroom" would have an effect on the number of jobs available, but stated "it's really impossible to determine exactly." (Tr. 71-72.)  Lastly, the VE testified an employer would not typically tolerate an employee who

19

was off task more than 15% of the time and absent more than once per month.  (Tr. 72.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

20

age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the

claimant's impairment or combination of impairments does not prevent her from doing her past

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent her from doing her

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Hickok was insured on her alleged disability onset date, September 25, 2013, and

remained insured through December 31, 2019, her date last insured ("DLI.")  (Tr. 20.)

Therefore, in order to be entitled to POD and DIB, Hickok must establish a continuous twelve

month period of disability commencing between these dates.  Any discontinuity in the twelve

month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th

Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Ms. Hickok meets the insured status requirements of the Social Security Act
      through December 31, 2019.

2.    Ms. Hickok has not engaged in substantial gainful activity since September
      25, 2013, the alleged onset date (20 CFR 404.1571 et seq.)

3.    Ms. Hickok has the following severe impairments: osteoarthritis,
      degenerative disc disease, and lumbar spondylosis and stenosis, and chronic
      venous insufficiency in both lower extremities with bilateral ankle edema (20
      CFR 404.1520(c)).

4.    Ms. Hickok does not have an impairment or combination of impairments that
      meets or medically equals the severity of one of the listed impairments in 20
      CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and
      404.1526).

5.        After careful consideration of the entire record, I find that Ms. Hickok has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ramps and stairs. She cannot climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She cannot reach overhead with the left arm.

6.        Ms. Hickok is capable of performing past relevant work as a Grocery Store Cashier. This work does not require the performance of work-related activities precluded by Ms. Hickok's residual functional capacity (20 CFR 404.1565).

7.        Ms. Hickok has not been under a disability, as defined in the Social Security Act, from September 25, 2013, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 20-30.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

22

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Treating Physician Opinions*

In her first assignment of error, Hickok argues the RFC "is unsupported by substantial evidence because the ALJ improperly subordinated the opinion of treating physician Dr. Haas and improperly relied upon the non-examining opinion evidence."  (Doc. No. 12 at 15.) Specifically, she maintains the ALJ failed to articulate "good reasons" for rejecting Dr. Haas' October 2014 opinion Hickok "is unable to perform repetitive [upper extremity] work and [due to] back issues [illegible] to perform lifting."  (*Id*. at 16-20.)  Hickok asserts the reasons provided by the ALJ are either inaccurate or irrelevant, arguing the evidence does not support the ALJ's conclusion Dr. Haas' opinion (1) was based solely on Hickok's response to questioning, and (2) failed to address duration.  (*Id.*)  Hickok further argues remand is required because the ALJ failed to acknowledge "the evidence of record is highly consistent with" both Dr. Haas' October 2014 opinion and her later, undated opinion.  (*Id*.)  Finally, Hickok argues the ALJ erred in according greater weight to the opinions of state agency physicians Drs. Delphia and Thomas because their opinions were rendered prior to (1) the February 2015 MRI of her right knee showing a horizontal tear and grade 3 chondromalacia; (2) Dr. Haas' later, undated opinion (completed in or after February 2015); and (3) Dr. Mohseni's finding Hickok suffered from chronic venous

24

insufficiency.  (*Id*. at 21-22.)

The Commissioner argues the ALJ properly evaluated the opinion evidence of record. (Doc. No. 13 at 7-13.)  She maintains "Dr. Haas did not propose any actual work-related restrictions," arguing "her medical assessment forms offered only vague suggestions that plaintiff had lower back and arm problems, and knee and shoulder problems."  (*Id*. at 7.)  The Commissioner argues "the ALJ is simply not required to assign weight to medical opinions that fail to offer any specificity regarding a claimant's limitations."  (*Id*. at 8.)  She notes the ALJ discounted Dr. Haas' October 2014 opinion on the ground it was both unclear and unsupported by "the preponderance of the file evidence," and argues this finding is supported by substantial evidence.  (*Id*. at 9-11.)  Finally, the Commissioner argues the ALJ properly evaluated the opinions of Drs. Delphia and Thomas because he "clearly acknowledged that the non-examining doctor[s] had not reviewed the whole record, and adjusted his residual functional capacity accordingly."  (*Id*. at 12.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c),[4] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id*.  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining

---

[4] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.* In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Social Security Ruling ("SSR") 96–6p, 1996 WL 374180 at *2 (Soc. Sec. Admin. July 2, 1996).[5]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[6] Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not

---

[5] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* SSA 17-2p, 2017 WL 3928306 at * 1 (SSA Mar. 27, 2017).

[6] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings,

give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the

---

its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

record." *Rogers*, 486 F.3d at 243.[8]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As discussed *supra*, Dr. Haas submitted two opinions regarding Hickok's physical functional abilities and limitations during the relevant time period. On October 10, 2014, Dr.

---

[8] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id*. § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

Haas indicated Hickok suffers from chronic pain, sciatica and restless limb syndrome, cervical radiculopathy, left shoulder torn rotator cuff, diverticulitis, lower back pain, fibromyalgia, and depression.  (Tr. 361-363.)  She stated Hickok experiences fatigue and reduced mobility in her left upper extremity.  (*Id*.)  When asked to describe "any limitations his/her impairment(s) imposes on the ability to perform sustained work activity," Dr. Haas indicated Hickok "works as cashier and therefore unable to perform repetitive upper extremity work and back issues [illegible] to perform lifting."  (Tr. 363.)  Dr. Haas concluded by stating Hickok "is requesting total disability."  (*Id*.)

Sometime later, Dr. Haas completed an undated questionnaire in which she identifies the "date of [Hickok's] illness/injury/surgery" as approximately 2014 due to fibromyalgia.  (Tr. 421-422.)  She indicates Hickok is "not progressing" and notes she had been referred to orthopedics, vascular medicine, and pain management.  (*Id*.)  When asked to identify "other restrictions or limitations," Dr. Haas states Hickok is (1) unable to mobilize her right knee due to athroscopy in February 2015; (2) unable to lift her shoulder due to her rotator cuff tear; and (3) suffering from chronic pain.  (*Id*.)  Dr. Haas opined Hickok's hours should be reduced from 20 to 15 hours per week, and recommended she go on long-term disability "soon."  (*Id*.)

The ALJ evaluated the first of Dr. Haas' opinions (dated October 2014) at two separate points in his step four analysis.  (Tr. 27-29.)  After discussing Hickok's treatment for back, shoulder, and elbow pain, the ALJ noted "[l]ater in October [2014], the treating physician opined that Ms. Hickok was unable to perform the repetitive work required as a cashier due to her upper extremity conditions, and that her shoulder and back conditions had resulted in significant lifting limitations."  (Tr. 27)  Several paragraphs later, the ALJ states as follows:

29

Ms. Hickok alleged she was disabled due to fibromyalgia, back pain, arthritis, and depression. The medical evidence shows that she might have some pain and discomfort as a result of her physical impairments. * * * I [] find that the assessed physical limitations do not prevent her from performing her past work as a grocery store cashier. **Her physician, Dr. Haas, provided an opinion regarding her condition and functional limitations; however, it was not clear nor was it supported by the preponderance of file evidence, therefore it was afforded little weight.**

(Tr. 28) (emphasis added).

Later in the decision, the ALJ again evaluated Dr. Haas' October 10, 2014 opinion, this time finding as follows:

I have considered and give **no weight** to the October 10, 2014 treatment note by Dr. Haas, Ms. Hickok's primary care physician, who stated Ms. Hickok worked as a cashier and therefore was unable to perform repetitive upper extremity work with lifting and back issues.  Dr. Haas noted "She is requesting total disability" (Ex. 5F, p. 4).

This does not get controlling or great weight because the testimony was that the [sic] Dr. Haas asked Ms. Hickok the questions and Ms. Hickok answered them.  Also, the fact that she cannot do her past work does not establish she cannot do other work. The statement also does not address duration.

An opinion that a claimant is "unemployable" also involves consideration of vocational issues and is reserved for the Commissioner of Social Security, or to the Commissioner's designees, to resolve pursuant to 20 CFR 404.1503 and 404.1527(e).

(Tr. 29)(emphasis added).  The ALJ does not expressly discuss or address Dr. Haas' later, undated opinion (completed in or after February 2015) at any point in the decision.

With regard to Dr. Haas' October 2014 opinion, the Court finds the ALJ failed to provide "good reasons" for rejecting this opinion.[9]  As an initial matter, the ALJ failed to clearly

---

[9] It is undisputed Dr. Haas was Hickok's treating physician at the time she authored her October 2014 opinion.  As noted *supra*, Hickok established treatment with Dr. Haas in August 2012.  The record reflects Dr. Haas examined Hickok eleven (11) times between August 2012 and her October 10, 2014 opinion.

articulate the weight accorded to this opinion.  The ALJ initially found Dr. Haas' October 2014 opinion to be entitled to "little weight" (Tr. 28) but then, nine paragraphs later, indicates this same opinion is accorded "no weight" (Tr. 29.)  The ALJ offers no explanation for this discrepancy nor does the decision articulate what (if any) aspects of Dr. Haas' October 2014 opinion are accorded little (i.e., some), as opposed to "no," weight.  As another court within this District has noted, "an ALJ should structure the decision to remove any doubt as to the weight given the treating source's opinion."  *Sito v. Comm'r of Soc. Sec.*, 229 F.Supp.3d 633, 641 (N.D. Ohio 2017).  Here, the ALJ provided conflicting statements regarding the weight given to Hickok's treating physician opinion, without any clarification of the discrepancy.[10]

More importantly, the Court finds the reasons provided by the ALJ for discounting Dr. Haas' October 2014 opinion are not supported by substantial evidence.  The first reason provided by the ALJ for rejecting Dr. Haas' opinion is "the testimony was that [] Dr. Haas asked Ms. Hickok the questions and Ms. Hickok answered them."  (Tr. 29.)  Although not entirely clear, this statement suggests the ALJ rejected Dr. Haas' October 2014 opinion, in part, because he believed Dr. Haas did not perform independent testing to determine the nature and scope of Hickok's physical functional limitations and, instead, simply asked Hickok and took her word for it.  As explained below, however, the hearing testimony does not support this conclusion.

---

[10] The decision is not a model of clarity but, for the following reasons, it appears from context the ALJ's conflicting statements are both in reference to Dr. Haas' October 2014 opinion.  As noted above, the ALJ discusses the October 2014 opinion (citing Exhibit 5F, p 4) on page 8 of the ALJ decision and, then, several paragraphs later, states Dr. Haas' opinion is accorded "little weight."  Later in the decision, the ALJ again references Dr. Haas' October 2014 opinion (again, citing Exhibit 5F, p. 4) and affords it "no weight." The ALJ does not, at any point in the decision, evaluate Dr. Haas' later, undated opinion. Thus, the Court presumes the ALJ is referencing the October 2014 opinion both when assigning "little weight" and "no weight."

The record reflects that, during the hearing, Hickok provided a copy of Dr. Haas'
second, undated opinion (completed in or after February 2015) to the ALJ.  (Tr. 48.)  The ALJ
reviewed this opinion and remarked it was already in the record, at Exhibit 6F, 1, noting "I
wasn't sure when this was completed or when this was signed."[11]  (*Id.*)  The Court notes Exhibit
6F, 1 of the administrative record is Dr. Haas' undated opinion completed in or after February
2015.  (Tr. 421.)  The ALJ then asked Hickok the following:

> Q:    Okay, now, were you present when that form was filled out?
>
> A:    This one?
>
> Q:    Yes, the one--
>
> A:    Yes.
>
> Q:    --  you handed me.
>
> A:    Yes.
>
> Q:    And how did the -- Dr. Haas arrive at the answers on that form?  I mean
>       did she talk to you and then you told her the answers?  Did she perform
>       tests, you know, have you –
>
> A:    She --
>
> Q:    --   lift weights?
>
> A:    She performed --
>
> Q:    Did she have you – okay, what types of things did she have you do,
>       please?
>
> A:    She had me bend.
>
> Q:    Did she –

---

[11] By contrast, Dr. Haas' October 2014 opinion very clearly sets forth the date on which it
was completed.  (Tr. 361.)

A:      It was like light stuff, bend and stuff.

Q:      Did she have you pick up weights?

A:      No, I didn't get to do that.

Q:      Okay.  How did she determine that you could only pick up ten – or five pounds or less?

A:      Well, previously from when I had went for a worker's comp related –

Q:      Did you tell her that? Or did –

A:      Yes.

Q:      Okay, thank you.

A:      Because I had a weight restriction.

Q:      Okay thank you, you answered my question.

A:      Okay.

Q:      We have limited time, so –

A:      I'm sorry.

(Tr. 49-50.)

        As an initial matter, while the ALJ rejected Dr. Haas' October 2014 opinion on the grounds it was based solely on answers provided by Hickok, the hearing testimony that forms the basis of this conclusion was in reference to an entirely separate opinion, i.e., Dr. Haas' second, undated form that was completed in or after February 2015.  Second, Hickok did not, in fact, testify Dr. Haas completed the questionnaire by simply asking Hickok for the answers.  To the contrary, Hickok testified Dr. Haas asked her to engage in at least some physical activities, such as bending and other "light stuff," when assessing Hickok's physical functional limitations. While Hickok acknowledged Dr. Haas did not ask her to perform any lifting, Hickok tried to

33

provide further explanation for the basis of Dr. Haas' lifting limitations.  However, the ALJ cut her off on the grounds "we have limited time."  (Tr. 50.)  In light of all of the above, the Court finds this reason for rejecting Dr. Haas' October 2014 opinion does not constitute a "good reason" for purposes of the treating physician rule.

The second reason provided by the ALJ for rejecting Dr. Haas' October 2014 opinion is as follows:  "[T]he fact that she cannot do her past work does not establish she cannot do other work." (Tr. 29.)  As Hickok correctly notes, however, the ALJ expressly found she was not disabled because she was capable of performing her past work as a grocery store cashier. (Tr. 29-30.)  The ALJ did not ask the VE to identify any other work that a hypothetical individual with Hickok's limitations could perform and, thus, did not proceed at step five to identify any other jobs that Hickok could perform consistent with the RFC.  Under these circumstances, the Court finds the ALJ's second reason for rejecting Dr. Haas' October 2014 opinion does not constitute a "good reason."

The third reason provided by the ALJ for rejecting Dr. Haas' October 2014 opinion is that "the statement also does not address duration."  (Tr. 29.)  While Dr. Haas did not expressly state Hickok's impairments were expected to last 12 months in duration, it is undisputed (1) Hickok established treatment with Dr. Haas in August 2012; and (2) Dr. Haas examined her on at least eleven (11) occasions prior to authoring her October 10, 2014 opinion.  During these visits, Hickok repeatedly complained of chronic pain in her lower back, shoulders, knees, arms, and left elbow.  (Tr. 370-371, 375-376, 381-382, 387-392, 394-395.)  In addition, a December 2012 MRI showed a full-thickness tear in Hickok's left shoulder; Hickok was repeatedly thereafter diagnosed with left rotator cuff tear; and treatment notes found reduced range of motion/mobility

34

in her left upper extremity during the relevant time period.  (Tr. 404-405, 366-367.)  The ALJ does not provide any further explanation, or cite any medical evidence, for rejecting Dr. Haas' opinion on the grounds it failed to specifically address duration.  Under these circumstances, the Court finds this reason for rejecting Dr. Haas' October 2014 opinion does not constitute a "good reason."

The fourth reason provided by the ALJ for rejecting Dr. Haas' October 2014 opinion is that "[a]n opinion that a claimant is 'unemployable' also involves consideration of vocational issues and is reserved for the Commissioner of Social Security, or to the Commissioner's designees, to resolve pursuant to 20 CFR 404.1503 and 404.1527(e)."  (Tr. 29.)  While this is an accurate statement of law, the Court is not convinced Dr. Haas opined Hickok is "disabled" from all work in her October 2014 opinion.  Rather, Dr. Haas states Hickok is "unable to perform repetitive [upper extremity] work" and has difficulty lifting due to her "back issues."  (Tr. 363.)  The Court does not construe this statement as an opinion on the ultimate issue of disability.  Rather, Dr. Haas' opinion sets forth her assessment of Hickok's limitations in certain functional areas, i.e., her abilities to lift and to engage in repetitive work with her bilateral arms.  Thus, the Court finds this reason for rejecting Dr. Haas' October 2014 opinion does not constitute a "good reason."

The fifth reason provided by the ALJ for rejecting Dr. Haas' October 2014 opinion is that was "not clear."  (Tr. 28.)  The ALJ does not offer any further explanation for his decision to reject Dr. Haas' opinion on this basis.  The Court acknowledges Dr. Haas' opinion regarding Hickok's ability to lift is partially illegible and, therefore, unclear.  (Tr. 363.)  However, Dr. Haas also clearly opines Hickok is "unable to perform repetitive UE [i.e., upper extremity] work."  (*Id.*)

35

In addition, and as support for this opinion, Dr. Haas states Hickok suffers from ongoing decreased mobility in her left upper extremity. (Tr. 362.) While Dr. Haas' opinion Hickok cannot engage in repetitive work with her upper extremities may be a severe limitation, the Court is not persuaded it is "unclear." Absent any further explanation from the ALJ regarding this issue, the Court finds this reason for rejecting Dr. Haas' October 2014 opinion does not constitute a "good reason."

Finally, the ALJ states, summarily, that Dr. Haas' October 2014 opinion is afforded "little weight" because it is not "supported by the preponderance of the file evidence." (Tr. 28.) The Sixth Circuit has made clear, however, that an ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for rejecting these opinions. *See, e.g., Friend v. Comm'r of Soc. Sec*., 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Rogers*, 486 F.3d at 245–46 (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Bartolome v. Comm'r of Soc. Sec*., 2011 WL 5920928 (W.D. Mich. Nov. 28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010 WL 2232309 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the

36

objective medical evidence and appears to be based solely on [claimant's] subjective performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio Apr.23, 2012) (finding the ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported).

The Commissioner argues remand is not required because the ALJ discussed Dr. Haas' treatment history with Hickok earlier in the decision.  This argument is without merit.  While the ALJ recited some of the medical evidence earlier in the decision, he failed to offer any meaningful *explanation* for his conclusion that Dr. Haas' October 2014 opinion was inconsistent with that evidence.  *See Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cassels v. Comm'r of Soc. Sec.*, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The ALJ, for example, 'does not offer any explanation for his conclusion' that "the treating physician's opinions were inconsistent with the medical evidence,' which is enough by itself for error.")

Finally, the Commissioner asserts other record evidence is inconsistent with Dr. Haas' opinions, including Hickok's testimony she continued to work part time throughout the relevant time period, treatment notes indicating normal physical examination findings, and the state agency physicians' opinions she could perform a reduced range of light work.  The Commissioner, however, cannot cure a deficient opinion by offering explanations that were not offered by the ALJ.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn*, 2013 WL 3967282 at * 8; *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013);

37

*Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  Here, the various

arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for

rejecting Dr. Haas' October 2014 opinion.  Accordingly, this Court rejects the Commissioner's

*post hoc* rationalizations

In sum, the Court finds the ALJ failed to set forth good reasons for rejecting Dr. Haas'

October 2014 opinion.  Accordingly, the Court recommends a remand is necessary, thereby

affording the ALJ the opportunity to properly address the physical functional limitations assessed

by Dr. Haas therein.

It is further recommended that, on remand, the ALJ should acknowledge and specifically

address Dr. Haas' later, undated opinion (completed in or after February 2015.)  As noted above,

while this opinion was part of the administrative record before the ALJ, the ALJ failed to

articulate the weight assigned to it or provide any discussion of Dr. Haas' specific opinions that

Hickok was unable to mobilize her right knee and unable to lift due to her left shoulder rotator

cuff tear.  (Tr. 421.)

### Fibromyalgia

In her second assignment of error, Hickok argues remand is required because "the ALJ

did not mention fibromyalgia or myalgias as a medically determinable impairment or find it a

severe impairment."  (Doc. No. 12 at 23.)  She further asserts the ALJ "failed to discuss myalgias

at all" in the decision, arguing "this was harmful error as the ALJ's failure to consider an

impairment that consistently causes pain all over led to an RFC unsupported by substantial

evidence."  (*Id*.)  Specifically, Hickok claims the ALJ erred in failing to include limitations

related to fatigue or concentration.  (*Id*. at 25.)

The Commissioner argues remand is not required because "the ALJ repeatedly and thoroughly considered plaintiff's alleged pain from all of her impairments, including fibromyalgia," at step four.  (Doc. No. 13 at 14.)  She maintains the ALJ mentioned fibromyalgia six times in the decision, including noting Hickok had complained of fibromyalgia-related pain and her doctors had treated her for that condition.  (*Id.*)  The Commissioner also asserts the record does not support Hickok's claim her fatigue resulted in limitations in memory and concentration.  (*Id*. at 16.)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (emphasis added).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR § 404.1521; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187 at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings.  *Id.*

Further, the regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment."  SSR 06–03p, 2006 WL 2329939 at *2 (SSA Aug. 9, 2006);[12] 20 CFR 404.1513(a) and 416.913(a).  "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  SSR 96–4p, 1996

---

[12] SSR 06-03p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* 82 Fed. Reg. 15263 (March 27, 2017).

WL 374187 at *1.  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. §§ 404.1529(b) and 416.929(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, 2017 WL 749185 at * 6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2017 WL 655402 at * 8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.")  *See also Kavalousky v. Colvin*, 2013 WL 1910433 at * 7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of social security regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities ..." 20 CFR § 404.1520(c).  "Basic work activities" are defined as "the abilities and aptitudes

necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: (1) physical functions

such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2)

capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering

simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers,

and usual work situations; and (6) dealing with changes in a routine work setting.  *Id*.

      The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle,"

*Rogers*, 486 F.3d at 243, n. 2, intended to "screen out totally groundless claims."  *Farris v. Sec'y*

*of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL

508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect"

on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p,

1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just

one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an

individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184 at *5

(July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not

significantly limit an individual's ability to do basic work activities, it may--when considered with

limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id*.

"For example, in combination with limitations imposed by an individual's other impairments, the

limitations due to such a 'not severe' impairment may prevent an individual from performing past

relevant work or may narrow the range of other work that the individual may still be able to do."

*Id*.

      When the ALJ considers all of a claimant's impairments in the remaining steps of the

disability determination, the failure to find additional severe impairments at step two does "not

constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 2008 WL 508008 at * 5.

Here, the ALJ determined, at step two, that Hickok suffers from the severe impairments of osteoarthritis, degenerative disc disease, lumbar spondylosis and stenosis, and chronic venous insufficiency in both lower extremities with bilateral ankle edema. (Tr. 23.) He also found Hickok's anxiety, diverticulitis, and bronchitis were "non-severe" impairments. (Tr. 23-24.) The ALJ did not discuss Hickok's fibromyalgia at step two.

At step four, however, the ALJ the expressly acknowledged Hickok's claim she suffered from fibromyalgia, as well as sciatic nerve, thyroid disorder, torn rotator cuff, diverticulosis, bulging disc, restless leg syndrome, and arthritis. (Tr. 25.) The ALJ thoroughly discussed the medical evidence regarding Hickok's physical impairments, including the many objective test results in the record and her treatment course with both Drs. Haas and Keum. (Tr. 26-28.) Of particular relevance herein, at several points in his step 4 analysis, the ALJ noted Hickok's continuing complaints of fibromyalgia pain, as well as the fact she was treated for this condition by Dr. Keum. (Tr. 26-27.) The ALJ formulated the following RFC:

> After careful consideration of the entire record, I find that Ms. Hickok has the
> residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)
> except she can occasionally climb ramps and stairs. She cannot climb ladders, ropes,
> or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She cannot reach

overhead with the left arm.

(Tr. 25.)

The Court finds that, even if the ALJ erred in failing to consider whether Hickok's fibromyalgia constituted a MDI or severe impairment at step two, the ALJ's consideration of the cumulative effect of Hickok's impairments (including her fibromyalgia) throughout the remaining steps of the analysis rendered any such error harmless. *Maziarz*, 837 F.2d at 244.  The record reflects Hickok testified about her fibromyalgia at the February 2016 hearing.  (Tr. 47.)  At step four, the ALJ indicated he had "considered all symptoms and the extent to which these symptoms can reasonably be expected as consistent with the objective medical evidence and other evidence."

 (Tr. 25.)  At this step, the ALJ expressly acknowledged both Hickok's allegation she suffered from fibromyalgia and chronic pain, and her treatment for this condition by Drs. Keum and Haas. (Tr. 25-28.)  Although Hickok complains the ALJ failed to accommodate memory and concentration deficits allegedly resulting from her fibromyalgia-related pain and fatigue, Hickok fails to identify any specific mental limitations she believes should have been included in the RFC.  Nor does she direct this Court's attention to any medical opinion evidence indicating any particular mental limitations are warranted. To the contrary, and as the Commissioner correctly notes, the record reflects Dr. Pickholtz found Hickok's capacity to (1) understand, remember and carryout instructions did not reflect any significant impairment; and (2) perform one to three step tasks appeared to be "slightly impaired at worst.  (Tr. 309.)  In addition, both Drs. Richardson and Haskins found Hickok was only mildly restricted in maintaining concentration, persistence, and pace.  (Tr. 85, 95-96.)

43

Accordingly, and for all the reasons set forth above, the Court finds Hickok's second assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 31, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

44